Robert L. Barnard v. Commissioner.
Barnard v. Commissioner
Docket No. 1131-62.
United States Tax Court
T.C. Memo 1963-338; 1963 Tax Ct. Memo LEXIS 6; 22 T.C.M. (CCH) 1773; T.C.M. (RIA) 63338; December 27, 1963
Benjamin Becker, for the petitioner. Frederic S. Kramer, for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: A deficiency in 1959 income tax of $220 has been determined. The issue is whether cash advances made by petitioner (1) constituted an allowable nonbusiness bad debt under section 166(d), I.R.C. 1954, or, if not, (2) constituted a deductible loss under section 165(c), I.R.C. 1954. Findings of Fact Petitioner Robert L. Barnard (hereinafter referred *7 to as petitioner) is an individual presently residing at 121 Madison Avenue, Borough of Manhattan, City and State of New York. He filed a timely income tax return for the taxable year 1959 with the district director of internal revenue, Manhattan district, New York. Prior to and during the entire taxable year of 1959, petitioner was engaged full time in the IBM servicing and computing business. Petitioner was the dominant stockholder actively participating in the management of Barnard, Inc., located at 432 Fourth Avenue, New York, New York. In October 1957 the Barr-Barnard Company (hereinafter referred to as the company) was formed. According to the "Business Certificate for Partners" filed with the county clerk and clerk of the Supreme Court of New York, Albert W. Barr (hereinafter referred to as Barr) and Inez Barnard (hereinafter referred to as Inez), the sister of petitioner, were partners in the company. Inez had no interest in the company. She contributed no investment to the company and performed no services. She did not at any time function within the company or exercise any supervision or control. Inez received no money or compensation in any form from the company. *8 Petitioner, by virtue of his standing in the business community, loaned his name for the benefit of the company. The company was formed for the purpose of selling industrial chemicals, which business was in no way related to the business conducted by Barnard, Inc. No written partnership agreement was ever entered into between Barr and either Inez or petitioner. No agreement was ever entered into between petitioner and Barr whereby petitioner and Barr were to share the profits or losses from the company. Petitioner advanced the company $3,000 cash to open its bank account on October 10, 1957. Subsequently, petitioner made other cash deposits in the company's account in order to keep the company solvent. The advances of money by petitioner were made because he wanted to help Barr, who was his friend, get started in business. Barr did not invest any money in the business. At the time petitioner advanced the money to the company he expected it to be repaid to him. Petitioner did not advance the money with the expectation of making a profit. There were no due dates set for the repayment of any of the advances made by petitioner. The repayment of the advances to Barr was contingent *9 upon the existence of company profits; if there were no profits, there was no obligation on the part of Barr to repay any advances. In addition to the advances, petitioner purchased office furniture for the company in October 1957 for $600 cash. Petitioner also co-endorsed a bank note with Barr in the amount of $800 for a loan made to the company for the operation of the business. Petitioner's endorsement on the note was necessary in order for the company to borrow money from the bank, as the company had no credit standing. Petitioner did not at any time receive a note from Barr or the company with regard to any indebtedness owing from Barr or the company to petitioner. Petitioner never made a written agreement with either Barr or the company evidencing any indebtedness from either Barr or the company to petitioner. There was no provision for the payment of interest on any of the advances made by petitioner to the company. Petitioner's only protection was that all checks had to be signed jointly, so that Barr could not receive anything from the company profits until petitioner was repaid in full. Petitioner never received any compensation from the company. He had nothing to *10 do with the management of the company. He and Barr had brief conferences two or three times a month when the checks had to be signed. From October 1957 to mid-year 1958 Barr lived with petitioner. They had some business discussions in the evenings after business hours. In January or February 1959 Barr disappeared. Before he departed, Barr collected in his own name on bills owing to the company. He induced the indebted companies to make their checks payable to him personally rather than to the company. He did not turn the money over to the company. Petitioner attempted to trace Barr. Upon finding that Barr could not be located, petitioner paid the following company bills: (1) $800 to the Chemical Corn Exchange Bank by check dated April 23, 1959 as repayment of the bank note which petitioner had co-endorsed with Barr; (2) $400 to an attorney for defending a case brought by a supplier against the company prior to Barr's disappearance; (3) $56.99 to the New York Telephone Company on February 16, 1959; and (4) $18.10 to "We-Answer-Phones-Inc." on August 4, 1959. During the period of its existence, the company realized no profit. It did not file any partnership return or any other *11 type of income tax return. After Barr's disappearance, petitioner received $540 repayment from the company. Petitioner had no hope of collecting any of the other money advanced to the company. Any funds paid out after Barr's disappearance were expended without hope of repayment. Petitioner was never engaged in a partnership with Barr. The company was not petitioner's business, nor did he have any expectation of making a profit from it. Repayment of petitioner's advances by either Barr or the company was contingent on the earning of profits by the company, and no profits were earned. No debt was ever created between Barr or the company and the petitioner. Opinion Petitioner does not contend that he is entitled to a business bad debt deduction, cf. Darwin O. Nichols, 29 T.C. 1140, 1145 (1958), but claims deductibility for a nonbusiness bad debt [1] or, in the alternative, for a loss [2] resulting from the operation of a partnership. *12 A nonbusiness as well as a business bad debt requires that there be an indebtedness. Zimmerman v. United States, 318 F. 2d 611 (C.A. 9, 1963). Aside from the circumstance that there was no note or other instrument of indebtedness, no due date, and no provision for interest, the existence of a contingency alone is fatal to petitioner's first contention. As he testified, repayment of his advances was conditioned upon the existence of company profits, and, in the absence of profits, neither Barr nor the company owed anything. * * * The fact that the obligation to repay was subject to a contingency which did not occur alone [precludes] a finding that a bona fide debt (business or nonbusiness) existed. [Zimmerman v. United States, supra at 613.] We have been referred to no authority, and have found none, permitting us to characterize this as a debt either for tax purposes or under the applicable New York law. Cf. William Park, 38 B.T.A. 1118 (1938), affd., 113 F. 2d 352 (C.A. 3, 1940). On the contrary, the essential requirement of a debt is the absolute obligation to pay. Hattie Wolff, 26 B.T.A. 622, 626 (1932). *13 * * * The liability to pay in the future, contingent upon something which may or may not occur, is not indebtedness, and the taxpayer may not treat as worthless debt amounts which are at a particular time merely contigent liabilities. * * * Where the liability to pay is not absolute, the existence of a deductible debt has not been accepted. [Milton Bradley Co. v. United States, 146 F. 2d 541, 542 (C.A. 1, 1944).] Petitioner's alternative contention must also fail. His testimony that he advanced the money without any expectation of making a profit, as well as the absence of any agreement to share profits and losses, precludes deductibility as a loss. Whatever Barr's business may have been, it was not that of petitioner. And "[when] there is no intended profit and naturally could be none, there is no just demand for a deduction of a loss." Edgar M. Carnrick, 21 B.T.A. 12, 22 (1930). The result may be unfortunate, especially in the light of petitioner's obvious sincerity and candor. But we must take the record and the law as we find them. Decision will be entered for the respondent. Footnotes
1. SEC. 166 [I.R.C. 1954]. BAD DEBTS. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩
2. SEC. 165 [I.R.C. 1954]. LOSSES. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * *↩